CLERKS OFFICE U.S. DIST. COURT
AT ROANOKE, VA

September 04, 2024

LAURA A. AUSTIN , CLERK
BY   KRISTIN AYERSMAN
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **LISA M. SMITH, individually and in her capacity as Executrix and Personal Representative of the Estate of Shawn A. Smith (deceased),** | ) ) ) ) ) | |
| **Plaintiff,** | ) ) | **Case No. 7:22-cv-588** |
| **v.** | ) ) ) | **By:    Michael F. Urbanski Senior United States District Judge** |
| **MATTHEW W. JENNINGS and ROANOKE COUNTY, VIRGINIA,** | ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This matter is before the court on two motions for summary judgment, one filed by each defendant. ECF Nos. 188, 190. The motions are fully briefed, including supplemental briefing on the issue of Monell[1] liability for defendant Roanoke County, Virginia ("Roanoke County"), and the court heard argument on July 25, 2024. For the reasons provided below, defendant Roanoke County's Motion for Summary Judgment, ECF No. 188, is **GRANTED**, and defendant Matthew W. Jennings' Motion for Summary Judgment, ECF No. 190, is **DENIED**. The case remains set for a jury trial beginning on September 30, 2024, on plaintiff Lisa M. Smith's claims against Jennings.

## I.  BACKGROUND

This case involves the shooting death of a citizen by an officer with the Roanoke County Police Department. The evidence shows that, on the evening of November 26, 2021

---

[1] Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

(the day after Thanksgiving), Shawn Smith ("Smith") and his wife, Lisa Smith, were in their home when Smith became upset and retrieved a handgun. L. Smith Dep. Tr. 48:6–10, 62:9–22; 68:17–69:18.[2] He loaded the gun and placed it under his chin and then the back of his head and said, "I can't do this anymore." Id. at 70:7–72:5. He then went into the living room and began closing the blinds to the windows. Id. at 72:20–73:3. Lisa Smith believed that, after he finished closing the blinds, he was going to kill himself. Id. She ran out of the house to find help. Id. at 74:6–8. She sought out Kenneth Starkey, who was a friend of Smith's and lived nearby, to ask him to get the gun away from Smith. Id. at 75:25–78:22. Starkey initially agreed, but then decided it would be better to call the police. Id. at 78:21–79:24.

Starkey called 911 at around 6:58 p.m. See Dispatch Report, ECF No. 197-9, at 6; L. Smith Dep. Tr. 82:17–19. Starkey and Lisa Smith told the 911 dispatcher that Smith had put a gun to his head and that Lisa Smith left the house to get help. L. Smith Dep. Tr. 83:16–22. Meanwhile, at around 6:50 p.m., a neighbor's residential camera captured Smith leaving his house in his truck and returning ten minutes later, just before police officers arrived at the house. There is no evidence regarding what Smith did or where he went during those ten minutes, but both sides suggest that Smith may have left the house to dispose of the gun.

Officer Melvin Minnix and Commander Jeffrey Johnson were dispatched to Starkey's home to speak with Lisa Smith. Minnix Dep. Tr. 21:11–19. While Minnix and Johnson went to Starkey's home, other officers, including Jennings, were dispatched to Smith's house to "start setting up a perimeter" in case Smith decided to leave the house with the firearm in

---

[2] In this memorandum opinion, the court refers Shawn Smith as "Smith" and his wife, plaintiff Lisa M. Smith, as "Lisa Smith" or "plaintiff."

search of his wife. Johnson Interview Tr., ECF No. 197-23, 6:4–7:5; Jennings Dep. Tr. 196:9–10.

Responding officers were told they were responding to a "domestic with weapon" because Smith had a gun. Jennings Dep. Tr. 156:21–22, 190:21–23; Dispatch Report, ECF No. 197-9, at 1; Johnson Dep. Tr. 36:4–10; Winstead Dep. Tr. 41:11–42:3. The report was that "there was a dispute between neighbor and his wife . . . and that a firearm was involved," and that the man "wasn't in his right mind." Johnson Interview Tr., ECF No. 197-23, 6:4–7; Dispatch Report, ECF No. 197-9, at 6 ("Husband is not in his right mind."). At around 7:03 p.m., dispatch reported to the responding officers that a "handgun [was] involved by him pointing it at himself during the arguments." Dispatch Report, ECF No. 197-9, at 6. At around 7:07 p.m., responding officers were told that Lisa Smith indicated "that the only gun in the [residence] should be the handgun he has in hand." Id.

Jennings arrived at Smith's home at 7:07 p.m. Jennings Dep. Tr. 196:18–23. Jennings was assigned to the southwestern rear corner of the house. Id. at 198:16–21. He took cover in the back corner of the yard, where the Smith property met the property of Smith's neighbors, Vicky and Steve Huff. Id. at 198:22–199:6. Officers on the scene attempted to make contact with Smith on his landline and cell phone and by loudspeaker. Johnson Interview Tr., ECF No. 197-23, 10:4–15; Rickett Interview Tr., ECF No. 197-58, 8:7–9:3, 15:3–7; Dispatch Report, ECF No. 197-9, at 4. Around 7:17 p.m., Jennings saw Smith pacing around the house with something in his hands. Dispatch Report, ECF No. 197-9, at 5 ("He still has something in hand–can't tell what it is. . . . He's paseing [sic] back and forth."); Jennings Dep. Tr. 217:16–21 ("I watched him walk by the window several time[s] with the black rigid object in his

hand."). Two minutes later, however, officers radioed that Smith turned off all of the lights in the house. Rickett Interview Tr., ECF No. 197-58, 9:3–7; Dispatch Report, ECF No. 197-9, at 5 ("He just blacked out the whole house.").

At Starkey's house, Lisa Smith told Johnson and Minnix that Smith had not been violent toward her that evening, and that "he was just . . . loosing it [sic]." Johnson Interview Tr., ECF No. 197-23, 7:19–8:9. Accordingly, at 7:21 p.m., Johnson—who was the "overall officer in charge" that night—radioed to his fellow officers, stating, "It's just a crisis situation, not domestic violence." Johnson Dep. Tr. 44:24–45:13; Dispatch Report, ECF No. 197-9, at 4; Johnson Interview Tr., ECF No. 197-23, 9:12–21 ("I advised units to standby . . . that [it] was a crisis situation, that there wasn't going to be domestic violence so they knew there wouldn't be any criminal charges."), 15:19–20. Based on that assessment, Minnix and Johnson decided to seek an Emergency Custody Order ("ECO") for Smith. Id. at 26:13–27:14. Minnix drove Lisa Smith to the magistrate's office in Salem, Virginia, to obtain the ECO, and Johnson went over to the Smith home. Minnix Dep. Tr. 27:22–28:11; Johnson Dep. Tr. 38:24–39:5.

Smith emerged from the side door of his house twice, at 7:31 p.m. and 7:47 p.m. Dispatch Report, ECF No. 197-9, at 4. Both times, Smith ignored police commands for him to show his hands, going back inside instead. Id. Around 7:48 p.m., the second time he came out, Smith stepped onto the screened-in porch in the back of the house, carrying an aluminum baseball bat. Jennings Dep. Tr. 255:4–9. Jennings testified that Smith "had [the bat] cocked over his shoulder" in a batter's stance. Id. at 255:10–14. Jennings directed Smith to drop the bat and show his hands. Id. at 255:19–256:4. Smith dropped the bat and ran back inside. Id.

Jennings radioed to his fellow officers, "Make a note that he came out armed with a bat, refused to drop it for a few seconds." Jennings Audio, ECF No. 197-55.

At 7:50 p.m., Smith reemerged onto the screened-in porch. Dispatch Report, ECF No. 197-9, at 3. Jennings testified that Smith's hand was under his shirt in a "finger gun" type position. Jennings Dep. Tr. 205:11–19. Jennings' body-worn microphone captures the two-minute exchange between Jennings and Smith that follows, during which Smith insists that he has no guns on the property:

> Smith: Yeah, I'm right here.
>
> Jennings: Let me see your hands!
>
> Smith: What did I do?
>
> Jennings: You're not under arrest. We need to talk to you.
>
> Smith: We can talk from here to there, son.
>
> Jennings: Alright, let me see your hands. Let me see your hands and we'll talk.
>
> Smith: We can talk right here, right now but I've been put through the judicial system, and I ain't very happy with the way I've been treated.
>
> Jennings: Well, why not? Talk to me.
>
> Smith: Because I ain't got a fair damn deal. That's why.
>
> Jennings: Well, what's going on?
>
> Smith: I don't know, you tell me! You're on my damn doorstep. You tell me.
>
> Jennings: Well… So, what's going on here with your ex-wife?[3]

---

[3] The record does not explain why Jennings thought that Lisa Smith was Smith's ex-wife.

Smith: Hell, I don't know. We got into an argument and she left.

Jennings: Well, why are we here?

Smith: You tell me!

Jennings: Well, we got a report that you had a gun involved.

Smith: Well, I'll tell you what.

Jennings: So, we'd like to talk to you about it. You're not under arrest. We'd just like to talk to you about it. Now, we're taking these precautions because there's a gun involved.

Smith: [Inaudible] you can search my damn premises and I'll let my dogs in the [inaudible] yard.

Jennings: Uh-huh.

Smith: And you can do it, but there ain't no damn gun on my damn property.

Jennings: Ok, I'd like to believe you on that. Now, would you like to come out here and talk to us?

Smith: [Inaudible] every damn firearm I ever purchased, I legally purchased. [Inaudible].

Jennings: Ok. Well, look, man, I'm not the ATF. I'm not here to take your guns. I'm here to talk to you about what's going on.

Smith: [Inaudible] y'all to take, man.[4]

Jennings: I'm here to talk to you about what's going on. Ok, ok. Well, would you like to come out and . . . Hey, man, I ain't got nothing personally against you.

---

[4] In briefing, Jennings asserts that Smith said, "There's nothing to take, man." Def.'s Mem. Supp., ECF No. 191, at 6. Plaintiff contends that Smith said, "There ain't any guns for y'all to take, man." Jennings Audio with Subtitles, ECF No. 242-2. In a recent filing, defendants assert that plaintiff has "doctored" the audio recordings by, inter alia, using inaccurate subtitles and altering the audio to amplify Smith's voice and strip background sounds. Defs.' Objs. to Pl.'s Additional Evidence, ECF No. 245. To be sure, defendants' concerns about the audio recordings are troubling, but at the end of the day are not material to the court's decision on summary judgment. The court will sort out these concerns before the audio is played at trial.

Smith: You know what I am? I am so damn sick of y'all. I've been ran through the damn ringer too many damn times.

Jennings: What's going on with it? Talk to me about it.

Smith: I don't know. You tell me. You got the call. You're on my damn doorstep. You're the ones [inaudible].

Jennings: Well, I'm trying to talk to you about it. Now, do you see where I am coming from? You came out with a bat and now I can't see your hands. You see where I'm coming from. I got a call about a gun. Now, obviously, I'm worried for my life about that. Now we're here.

Smith: Well, if that was the case, I would've done shot you by now because I know exactly where you are with the damn flashlight.

Jennings: Well, yeah. Come talk to me.

Smith returned inside the house. Dispatch Report, ECF No. 197-9, at 3. Jennings radioed:

He just went back inside after yelling. Be advised he's insisting nothing happened with a gun, but he's not gonna talk to us easily, I don't believe.[5]

Smith then came back out on the porch right after Jennings finishes radioing. Jennings' microphone again recorded their exchange, which lasted less than 15 seconds and ended in Smith's death:

Jennings: What's that attached to?

Smith: I got one, too.

Jennings: Is that a flashlight or a gun?

---

[5] Dispatch transcribed Jennings' statement as, "Doesn't believe he has the gun but I don't believe he's going to talk to us." Dispatch Report, ECF No. 197-9, at 3. Jennings testified at his deposition that dispatch transcribed it incorrectly. Jennings Dep. Tr. 153:8–17. Indeed, the court's review of the audio recording makes clear that Jennings said, "Be advised he's insisting nothing happened with a gun."

Smith: I don't know. You tell me. Am I pointing it at you?

Jennings: I don't know.

Smith: Then shoot me. You got probable cause.

Jennings: Yeah, you need to drop that.

Smith: Yeah.

Jennings fired two shots at him less than two seconds after Smith responded, "Yeah." Jennings Audio, ECF No. 197-55. Jennings and Smith were approximately 45 feet apart during the interaction, and Smith had remained on the screened-in porch the whole time. Jennings Dep. Tr. 166:22–167:4, 210:17–20.

Beyond the audio, however, there is little consensus regarding the final moments that led to the shooting. According to Jennings, when Smith reemerged onto the screened-in porch for the last time, Smith was pointing a strobing flashlight "directly at [Jennings]," "blind[ing] him." Jennings Dep. Tr. 166:9–21 ("I was being blinded by it, yes. It was on strobe function so your eyes can't adjust to the darkness."). Jennings also testified that Smith was holding his hands at chest level, wrists crossed in an FBI-style "modified Weaver" shooting stance, with the flashlight in one hand and a "large black object" in the other. Jennings Dep. Tr. 164:10–165:7, 207:15–23.

Jennings said that Smith was also making a "tactical move" that Jennings recognized called "cutting the pie," in which a person works their way around an object in a "C shape . . . to exploit cover for close quarter combat." Jennings Dep. Tr. 164:16–165:7; 209:9–210:16. Jennings testified that Smith was advancing toward him when he shot him. Jennings Dep. Tr. 211:16–23.

8

A substantially different account of the final moments before Smith's death comes from his neighbors, Steve and Vicky Huff. Steve and Vicky, both retired employees of the Roanoke County Sheriff's Department, went to their bedroom on the second floor of their house to get a better view of the police activity. S. Huff Dep. Tr. 26:24–27:20. Vicky was looking out of a window that was directly above where Jennings was set up and had a "clear view" of him. V. Huff Dep. Tr. 23:7–13. Vicky was also able to see Smith on the porch because he was "lit or backlit by some lights." Id. at 29:16–30:4. She testified that she saw Smith with a flashlight, which he was holding "up at his shoulder," and that the flashlight was not strobing. Id. at 30:5–31:7. In addition, she said that the beam of the flashlight was pointing away from Jennings, toward the backyard, when Smith was shot. Id. at 34:1–12. Vicky also testified that she did not see anything in Smith's left hand, that she never saw Smith with a gun that evening, and that she never saw him "move aggressively" toward Jennings. Id. at 28:22–24, 31:9–14.

Steve Huff likewise testified that, from his view from the window, he could see the silhouette of Smith on the porch holding the flashlight, and that the flashlight was not strobing. S. Huff Dep. Tr. 38:7–9, 40:7–22. In a statement that the Huffs provided a detective on the evening of the shooting, Steve said that the flashlight was "pointed up;" " [i]t wasn't pointed out at anybody or anything." Huff Interview Tr., ECF No. 197-57, at 24:19–23. Steve testified that he never saw Smith with a gun that night. S. Huff Dep. Tr. 38:10–12. He also testified that Smith was not moving toward Jennings when Jennings shot him. S. Huff Dep. Tr. 40:7–22 ("He stayed up in front of the sliding glass doors going into his house. There was a little landing-type thing. He stood there the whole time, and he never left there.").

9

Jennings fired two shots, both hitting Smith in the neck. Jennings Dep. Tr. 215:4–5; Johnson Interview Tr., ECF No. 197-23, 24:10–11; Hiner Dep. Tr. 75:9–15. Several officers ran onto the screened-in porch and began attempting to administer first aid until EMS arrived. Hiner Dep. Tr. 72:7–74:16. They found a "small, hand-held, tactical style" flashlight and a "large Bowie knife" beside Smith's body. Hiner Dep. Tr. 77:15–78:9; Johnson Interview Tr., ECF No. 197-23, 21:15–21; Conde Dep. Tr. 32:24–33:1; Winstead Dep. Tr. 140:1–6. Officer recollections vary regarding whether the flashlight was strobing when they entered the porch.[6]

Lisa Smith initiated this action on October 14, 2022, against Roanoke County, Virginia, and several others[7] for the alleged wrongful killing of Smith. Compl., ECF No. 1. She filed an amended complaint on December 16, 2022, to name Jennings as the police officer who fired the shots that killed Smith. Am. Compl., ECF No. 4. The amended complaint asserted nine causes of action: (1) a <u>Monell</u> claim against the Roanoke County Police Chief, Roanoke County Police Department, and Roanoke County (the "County defendants"); (2) a 42 U.S.C. § 1983 claim against Jennings for Fourth Amendment violations; (3) a § 1983 claim against Jennings for Fourteenth Amendment violations; (4) a Virginia wrongful death claim against the County defendants; (5) a Virginia wrongful death claim against Jennings; (6) a Virginia constitution claim against the County defendants; (7) a Virginia constitution claim against Jennings; (8) a

---

[6] Officer Hiner testified in his deposition that the flashlight was strobing as it laid beside Smith. Hiner Dep. Tr. 77:15–19. Commander Johnson testified that something was strobing on the porch, but that he could not recall whether the strobing was from Smith's flashlight. Johnson Interview Tr., ECF No. 197-23, 23:1–13. Officer Schartau told Sergeant Lewis during the internal investigation that the flashlight was "flickering"—"either like battery dying flickering or something like that or strobing." Schartau Dep. Tr. 81:12–23. Officer Winstead reported that the flashlight was on but did not indicate whether it was strobing. Winstead Dep. Tr. 139:15–21. Officer Conde stated that he could not recall whether the flashlight was illuminated at all when he entered the porch. Conde Dep. Tr. 33:3–8.

[7] Jennings was unnamed in the initial complaint, listed with seven others as John Does.

claim for punitive damages under Virginia law against Jennings; and (9) a § 1983 claim against seven John Does for Fourth Amendment violations. Am. Compl., ECF No. 4.

On June 12, 2023, the court granted in part defendants' motion to dismiss, dismissing several claims and defendants. Mem. Op. and Order, ECF Nos. 56, 57. On November 20, 2023, Smith sought leave to file a second amended complaint, ECF No. 120, which the Honorable C. Kailani Memmer, United States Magistrate Judge, granted during a hearing on February 6, 2024, ECF No. 144. The Second Amended Complaint dismissed the John Does, leaving only Jennings and Roanoke County as defendants. Second Am. Compl., ECF No. 120-1. Four claims remain: (1) a <u>Monell</u> claim against Roanoke County; (2) a § 1983 claim against Jennings for excessive force; (3) a Virginia wrongful death claim against Jennings; and (4) a punitive damages claim under Virginia law against Jennings. <u>Id.</u>[8]

On June 7, 2024, Jennings and Roanoke County filed motions for summary judgment on all claims. ECF Nos. 188, 190. Lisa Smith filed an opposition to the motions, ECF No. 197, and defendants replied, ECF Nos. 200, 201. The court held a hearing on the motions on July 25, 2024, and, with the court's leave, Lisa Smith later filed a supplemental response in opposition to Roanoke County's motion for summary judgment, ECF No. 235, and Roanoke County filed a reply, ECF No. 236.[9] Accordingly, the issues have been fully briefed and the motions are ripe for resolution.[10]

---

[8] Because the court struck portions of the Second Amended Complaint under Federal Rule of Civil Procedure 12(f), <u>see</u> Mem. Op. & Order, ECF Nos. 185, 186, the operative complaint is now the Fourth Amended Complaint, ECF No. 192, but the claims are unchanged.

[9] Smith also filed "notices of additional evidence" relating to Jennings' summary judgment motion without the court's leave. ECF Nos. 220, 225, 242.

[10] The court finds that an additional hearing on the supplemental briefing on Roanoke County's motion would not aid in its decisional analysis.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration

omitted) (quoting <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." <u>Anderson</u>, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" <u>Glynn</u>, 710 F.3d at 213 (quoting <u>Anderson</u>, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.</u>, 407 F.3d 631, 635 (4th Cir. 2005) (quoting <u>Anderson</u>, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." <u>Moss v. Parks Corp.</u>, 985 F.2d 736, 738 (4th Cir. 1993) (quoting <u>Anderson</u>, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. <u>World-Wide Rights Ltd. P'ship v. Combe Inc.</u>, 955 F.2d 242, 244 (4th Cir. 1992).

## III.   DISCUSSION

Jennings and Roanoke County, in separate motions, seek summary judgment on all claims. The court will address each in turn.

### A. Jennings' Motion

Jennings moves for summary judgment on the grounds that he did not violate Smith's Fourth Amendment right and, even if he did, he is entitled to qualified immunity because Smith's right was not clearly established when Jennings violated it. He also argues that, because the shooting was legally justified, he cannot be held liable for wrongful death under Virginia

law and that Smith is barred from recovery under contributory negligence. Upon careful review of the record and the relevant caselaw, the court concludes that genuine issues of material fact exist as to whether Jennings used excessive force in shooting Smith. Accordingly, Jennings' motion is **DENIED**.

## 1. Qualified Immunity

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The inquiry for determining whether a government official is protected by qualified immunity is two-pronged: The court must determine (1) whether the defendant's conduct violated a constitutional right and (2) whether that right was "clearly established" at the time of the alleged violation. Nazario v. Gutierrez, 103 F.4th 213, 230 (4th Cir. 2024) (citations omitted). "[C]ourts have discretion to begin with either prong of the qualified immunity analysis." Rambert v. City of Greenville, 107 F.4th 388, 398 (4th Cir. 2024) (citing Pearson, 555 U.S. at 236).

### i. Use of Force

Jennings first argues that he did not violate Smith's Fourth Amendment rights because he did not use excessive force. The Fourth Amendment protects against unreasonable seizures, including the right to be free from seizures made with excessive force. Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011). Accordingly, police officers are "constitutionally permitted to use only that force which is reasonable under the circumstances." Hupp v. Cook, 931 F.3d 307, 321 (4th Cir. 2019). "A police officer may use deadly force when the officer has

sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (citing Tennessee v. Garner, 471 U.S. 1, 11 (1985)). "[D]eadly force in the absence of such a threat is unreasonable." Rambert, 107 F.4th at 397 (citing Elliott, 99 F.3d at 642).

Whether the force was reasonable "requires careful attention to the facts and circumstances of each particular case." Graham v. Connor, 490 U.S. 386, 396 (1989). "Three factors, established by the Supreme Court in Graham, govern this analysis: (1) 'the severity of the crime'; (2) 'whether the suspect poses an immediate threat to the safety of the officers or others'; and (3) 'whether he is actively resisting arrest or attempting to evade arrest.'" Franklin v. City of Charlotte, 64 F.4th 519, 530 (4th Cir. 2023) (quoting Graham, 490 U.S. at 396). "[W]hen the historical facts are settled, the question of the objective reasonableness of officers' conduct is a question of law to be decided by the court." Rambert, 107 F.4th at 396; see also Armstrong v. Hutcheson, 80 F.4th 508, 514 (4th Cir. 2023).

In many cases involving an officer's use of force, the court has the benefit of body camera footage or similar recordings in the record. In those cases, the court must "view the facts in the light depicted by" those recordings. Rambert, 107 F.4th at 398–99 (quoting Scott v. Harris, 550 U.S. 372, 381 (2007)) (alteration omitted); see also Quinn v. Zerkle, No. 22-2187, 2024 WL 3610110, at *9 (4th Cir. Aug. 1, 2024) (relying on body camera footage showing that the subject was on the ground pointing an AR-15 in another officer's direction to conclude that deadly force was reasonable); Jones v. City of Danville, No. 4:20-cv-020, 2021 WL 3713063, at *8 (W.D. Va. Aug. 20, 2021) (emphasizing that the court's decision on summary judgment was based on the fact that the "circumstances of the shooting [were] clear

15

from the body camera videos," which showed that "Jones quickly swung his outstretched arms towards the officers as if he were pointing a firearm at them, and the officers reasonably interpreted his movements as a 'classic shooting stance'").

With these principles in mind, the court turns to the facts—those that are not disputed by the parties or are available to the court through the audio and video recordings—and applies them to the <u>Graham</u> factors. The first factor—"the severity of the crime"—weighs in plaintiff's favor because no crime had been committed. Instead, it was made clear to the responding officers—beginning with the initial dispatch—that, although Smith had a gun, he was experiencing a mental health crisis. Dispatch Report, ECF No. 197-9, at 6 ("Husband is not in his right mind;" "handgun [was] involved by him pointing it at himself during the arguments"). Further, at 7:21 p.m., Johnson—the "overall officer in charge" that night—confirmed for the officers on the scene that no criminal charges were being brought against Smith. Johnson Interview Tr., ECF No. 197-23, 9:12–21 ("I advised units to standby . . . that [it] was a crisis situation, that there wasn't going to be domestic violence so they knew there wouldn't be any criminal charges.").

This is further demonstrated by the fact that Jennings himself told Smith at least twice prior to the shooting that he was not under arrest and that the officers just "need[ed] to talk to [him]," Jennings Audio, ECF No. 197-55, and that Lisa Smith sought an Emergency Custody Order so that the officers could detain Smith for his own protection, <u>see</u> Emergency Custody Order, ECF No. 197-7; L. Smith Dep. Tr. 142:2–12 (testifying that she was not scared of Smith and that she did not think that he would hurt her). "Where a seizure's sole justification is preventing harm to the subject of the seizure, the government has little interest in using

16

force to effect that seizure." <u>Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst</u>, 810 F.3d 892, 901 (4th Cir. 2016). Accordingly, this factor weighs in favor of plaintiff.

The third factor—whether Smith was "actively resisting arrest or attempting to evade arrest"—weighs in Jennings' favor because, while Smith was told he was not under arrest, Smith ignored repeated commands to show his hands and speak with the officers.

The critical inquiry, however, is the second <u>Graham</u> factor—"whether the suspect poses an immediate threat to the safety of the officers or others." "In excessive force cases where an officer uses deadly force, the second <u>Graham</u> factor is particularly important." <u>Franklin</u>, 64 F.4th at 531; <u>see also</u> <u>Quinn</u>, 2024 WL 3610110, at *9 ("Excessive force analyses are fact specific, and the second <u>Graham</u> factor is particularly significant where the force was deadly."); <u>Knibbs v. Momphard</u>, 30 F.4th 200, 216 (4th Cir. 2022) (explaining that the officer's qualified immunity argument for use of deadly force "rests on the strength of the second" <u>Graham</u> factor). In these cases, "the question comes down to whether the circumstances presented an immediate threat that justified the officer's resort to lethal force as objectively reasonable." <u>Franklin</u>, 64 F.4th at 531.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham</u>, 490 U.S. at 396 (citation omitted); <u>see also</u> <u>Milstead v. Kibler</u>, 243 F.3d 157, 165 (4th Cir. 2001), <u>abrogated on other grounds by</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009) ("[C]ourts cannot second guess the split-second judgments of a police officer to use deadly force in a context of rapidly evolving circumstances, when inaction could threaten the safety of the

officers or others."); Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir. 1996) (explaining that Fourth Circuit precedent prohibits a "judicial second look").

However, the Fourth Circuit has also cautioned that, in deadly force cases, "special difficulties can arise during summary judgment" because, "[o]ften, the officer has killed the only other potential witness." Stanton v. Elliott, 25 F.4th 227, 234 (4th Cir. 2022). Accordingly, "[c]ourts should be careful at summary judgment to avoid simply accepting an officer's self-serving statements and must consider all contradictory evidence." Id. (citing Ingle ex rel. Est. of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006), and Brown ex rel. Lawhorn v. Elliott, 876 F.3d 637, 641 (4th Cir. 2017)). In other words, "[w]hile a jury could well believe the evidence forecast by [the officer], [the court] take[s] the facts in the light most favorable to [the plaintiff] to determine the applicable questions of law and ignore any contrary factual claims." Hensley on behalf of N.C. v. Price, 876 F.3d 573, 579–80 (4th Cir. 2017) (citing Mitchell v. Forsyth, 472 U.S. 511, 528–29 (1985)).

Here, like the deadly force cases that have come before it, this case turns on the critical issue of whether Jennings reasonably believed that Smith posed an immediate threat to the safety of himself or others when he decided to shoot Smith. For the reasons explained below, the court concludes that the disputed facts regarding Smith's physical actions and demeanor in the final moments before Jennings fired the shots—including Smith's stance, movements, and whether he was facing Jennings and directing the flashlight at him—preclude summary judgment on this issue.

The court finds the circumstances of Knibbs v. Momphard to be particularly applicable to those here. 30 F.4th 200 (4th Cir. 2022). There, officers were dispatched to a neighborhood

because of a board of nails laying across the road. Id. at 207. When officers approached Knibbs' front porch, they heard him racking his shotgun inside the house. Id. at 208–09. Officers shouted for Knibbs to drop his weapon, and, upon seeing him holding his shotgun through a window, an officer fired six shots, killing Knibbs. Id. at 208–10.

At his deposition, the officer testified that he shot Knibbs because Knibbs "was holding his shotgun right-handed in a firing position with the barrel aimed 'toward [his] face or [his] upper chest area.'" Id. at 210. Knibbs' estate challenged the officer's testimony that Knibbs was pointing the shotgun at the officer with their own evidence, including a forensic expert report and the officer's prior statements, in which he indicated that he did not know if the shotgun was "shouldered" or "under [Knibbs'] armpit." Id. at 210–11. The Fourth Circuit reversed the district court's grant of summary judgment, concluding that "whether Knibbs aimed his gun at [the officer]" was a "genuinely disputed fact that goes directly to whether he posed an objectively immediate threat." Id. at 216.[11]

Here, like in Knibbs, there is substantially conflicting evidence regarding the final moments before Jennings fires his weapon—principally, Smith's stance, movements, and the direction he was pointing his flashlight, which Jennings perceived as being mounted to or held alongside a gun, when the fatal shots were fired. Because these fact issues go "directly to whether [Smith] posed an objectively immediate threat," id., the court cannot grant summary judgment.

---

[11] The court also identified another disputed, material fact: whether the officer was "was 'readily recognizable as a law enforcement officer' on Knibbs' porch." Id. at 216.

The fact disputes arise from the marked differences in the testimony of three eyewitnesses: Jennings, on the one hand, and the Huffs, on the other. In Jennings' narrative of those final moments, Smith (1) was advancing toward him in an FBI-style "modified Weaver" shooting stance; (2) engaging in a tactical maneuver known as "cutting the pie"—in which a person works their way around an object in a C shape "to exploit cover for close quarter combat;" (3) holding a strobing flashlight in one hand and a "dark unknown object" in the other; and (4) directing the strobing flashlight at Jennings, "blinding" him.

In contrast, Steve and Vicky Huff, who could see both Jennings and Smith from their second story bedroom window, provide a meaningfully different account of the moments before Smith's death. Vicky testified that she saw Smith with a flashlight, which he was holding "up at his shoulder," and that the flashlight was not strobing. V. Huff Dep. Tr. 30:5–31:7. Importantly, she also testified that the beam of the flashlight was pointing away from Jennings, toward the backyard, when Smith was shot. Id. at 34:1–12.[12] Vicky also said that she did not see anything in Smith's left hand, that she never saw Smith with a gun that evening, and that she never saw him "move aggressively" toward Jennings. Id. at 28:22–24, 31:9–14.

Steve Huff likewise testified that he could see the silhouette of Smith on the porch holding the flashlight, and that the flashlight was not strobing. S. Huff Dep. Tr. 38:7–9, 40:7–22. Further, Steve recalled that the flashlight was "pointed up. . . . It wasn't pointed out

---

[12] Counsel for Lisa Smith suggests that Smith turned toward the backyard because he heard movement from other officers. Indeed, Officer Codi Rickett stated that, as Smith was "yelling" at Jennings, Officer Brittain Conde had jumped over the fence into Smith's backyard and that Rickett was also "trying to get over the fence and then [she] heard the shots go off." Rickett Interview Tr., 9:23–10:12. Accordingly, a reasonable jury could credit Rickett's testimony, combined with the Huffs', to conclude that Smith was looking into his backyard for the source of the noises from Rickett attempting to climb over Smith's fence when the fatal shots were fired.

at anybody or anything." Huff Interview Tr., ECF No. 197-57, at 24:19–23.[13] Steve also testified that he never saw Smith with a gun that night and that Smith was not in a "shooting position" or moving toward Jennings when he was shot. S. Huff Dep. Tr. 38:10–12, 40:7–22.[14]

The recording from Jennings' body-worn microphone, if anything, creates additional uncertainty. Principally, it shows that Smith told Jennings he did not have guns in the house. Jennings Audio, ECF No. 197-55 ("[T]here ain't no damn gun on my damn property."). Second, instead of verbally threatening Jennings, the audio shows that Smith invites Jennings to shoot him. Id. ("Smith: Then shoot me. You got probable cause. Jennings: Yeah, you need to drop that. Smith: Yeah.").[15] Moreover, Smith's voice is even and calm during the exchange, which may support the notion that Smith was not advancing toward Jennings. Accordingly, the court's review of the record shows at least four genuinely disputed and material facts: (1) whether Smith's flashlight was strobing; (2) whether Smith's flashlight, which Jennings perceived as being mounted to or held alongside a gun, was directed at Jennings in the moments before Jennings fired; (3) whether Smith was in a "shooting stance;" and (4) whether Smith was advancing toward Jennings and making tactical maneuvers.

---

[13] While this differs from Vicky's testimony that the flashlight was pointed at the backyard, both pieces of testimony could allow a reasonable jury to conclude that the flashlight was not directed at Jennings.

[14] In briefing, Jennings asks the court to discredit the Huffs' deposition testimony on the grounds that it conflicts with the statements they provided to the detective the night of the shooting. Def.'s Mem. Supp., ECF No. 191, at 9–10. Specifically, Jennings takes issue with the fact that the Huffs told the detective that they could not foreclose the possibility, based on what they were able to see, that the flashlight was mounted to a gun. Huff Interview Tr., ECF No. 197-57, at 25:8–12 (Detective Gallagher: "I mean, it could have been a flashlight or it could have been a weapon light . . . on a gun." Vicky Huff: "Right." Steve Huff: "Oh yeah."). Both at deposition and in the earlier detective interview, neither of the Huffs said they saw Smith with a gun. To the extent the Huffs' accounts are inconsistent, their credibility is an issue for the jury to weigh.

[15] Counsel for Jennings urges the court to conclude, based on this, that Smith wanted to commit "suicide by cop." Material factual disputes preclude the court from reaching this conclusion at this point.

In addition, the court's conclusion falls well within the Fourth Circuit's precedent in Anderson v. Russell, 247 F.3d 125 (4th Cir. 2001). There, Anderson lowered his hands toward a bulge that the officer perceived to be a gun—ignoring the officer's verbal commands to keep his hands raised—and the officer shot him. Id. at 130. Importantly, a witness testified that, "although Anderson was lowering his hands, he was lowering them slowly, and Anderson's hands 'were still around head level when he was shot.'" Id. The court noted that, at the time of the incident, the witness was between 20–30 feet away from Anderson, while the officers were only 10 feet away. Id.

The court rejected Anderson's contention that the witness's account created a genuine dispute of material fact. Id. at 131. The court reasoned that, "[i]n a rapidly evolving scenario such as this one, a witness's account of the event will rarely, if ever, coincide perfectly with the officers' perceptions because the witness is typically viewing the event from a different angle than that of the officer." Id. at 130. Accordingly, "minor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when, as here, the witness views the event from a worse vantage point than that of the officers." Id. at 131 (citing Sigman v. Town of Chapel Hill, 161 F.3d 782, 788 (4th Cir. 1998)).

Here, while Jennings argues that the Huffs' vantage point from the second story of their home renders their testimony not credible, Steve and Vicky Huff both testified that they were able to see Jennings and Smith during the pivotal moments at issue. Further, it is clear to the court that, unlike in Anderson, the conflicting testimony from Jennings and the Huffs do not constitute "minor discrepancies." Instead, as explained above, the Huffs' account of Smith's physical movements before Jennings shot him creates factual disputes that are central

22

to the issue of whether Jennings was facing an imminent threat requiring the exercise of deadly force—including (1) whether Smith's flashlight was strobing; (2) whether Smith's flashlight was directed at Jennings in the moments before Jennings fired; (3) whether Smith was in a "shooting stance;" and (4) whether Smith was advancing toward Jennings and making tactical maneuvers.[16]

Accordingly, following careful review of the evidence and the relevant caselaw, the court concludes that genuine issues of material fact preclude summary judgment regarding use of force—namely, whether Smith's physical actions and demeanor in the final moments before his death made Jennings reasonably believe that Smith posed an immediate threat. The factual disputes regarding the moments before Smith was shot is at the heart of the excessive force claim, and, accordingly, the court is unable to conclude as a matter of law that Jennings' shooting of Smith was a justified use of force. Those fact questions require resolution by the jury.

### ii. Clearly Established Violation

Because the court is unable to conclude whether Jennings violated Smith's Fourth Amendment right, it must proceed to the second prong of the qualified immunity analysis, which requires the court to determine whether Smith's Fourth Amendment right was clearly established. Because "it is 'sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts,'"

---

[16] Indeed, the Fourth Circuit recently concluded that the use of deadly force was reasonable because "the undisputed evidence show[ed] that just before the officers fired, [the subject's] gun was pointed at [the officers]." Caraway v. City of Pineville, No. 22-2281, 2024 WL 3658777, at *9 (4th Cir. Aug. 6, 2024). Here, in contrast, the parties dispute the nature of Smith's stance, his movements, and whether he was facing Jennings with his flashlight pointed at him at the time of the shooting.

Franklin, 64 F.4th at 534 (quoting Mullenix v. Luna, 577 U.S. 7, 12 (2015) (per curiam)), for a constitutional right to be "clearly established," "its contours 'must be sufficiently clear such that a reasonable official would understand that what he is doing violates that right,'" Nazario v. Gutierrez, 103 F.4th 213, 230 (4th Cir. 2024) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)); see also Henderson v. Simms, 223 F.3d 267, 271 (4th Cir. 2000) (explaining that the court must "evaluate whether a reasonable official would have understood that the conduct at issue violated the clearly established right").

"Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful.'" Franklin, 64 F.4th at 534 (quoting Kisela v. Hughes, 584 U.S. 100, 105 (2018) (per curiam)). Accordingly, in conducting this inquiry, the court should "examine 'cases of controlling authority in this jurisdiction,'" id. (quoting Amaechi v. West, 237 F.3d 356, 363 (4th Cir. 2001)), and identify any "case law finding that conduct similar to [Jennings'] was unconstitutional," Rambert, 107 F.4th at 402. However, the fact that a Supreme Court or Fourth Circuit "qualified immunity case with a fact pattern precisely identical to the instant one" does not exist "does not preclude a finding that the right was clearly established." Knibbs, 30 F.4th at 223 (citing White v. Pauly, 580 U.S. 73, 79 (2017)).

While "[d]istilling general guiding principles from Fourth Circuit excessive force precedent is well-nigh impossible," Franklin, 64 F.4th at 531, Knibbs again is instructive. There, the court concluded that, in April 2018, the Fourth Circuit's binding precedent "clearly establish[ed] that the failure to obey commands by a person in possession of, or suspected to be in possession of, a weapon only justifies the use of deadly force if that person makes some

sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person." Knibbs, 30 F.4th at 225 (emphasis added). The court continued by stating that, accordingly, "[i]f a jury finds that Knibbs was not aiming or otherwise directing his gun at [the officer]—the only fact that would have given him probable cause to fear for his life considering the totality of the Estate's evidence—this case would fall squarely within the contours of those clearly established precedents." Id. In other words, "if a jury accepts the Estate's version of the events, [the officer] could be found to have violated Knibbs' clearly established Fourth Amendment right." Id. at 226.

Similarly, here, if the jury accepted plaintiff's version of the events—that (1) Smith's flashlight was not strobing; (2) that Smith's flashlight, which Jennings perceived as being held with a gun, was not directed at Jennings in the moments before Jennings fired; (3) that Smith was not in a "shooting stance;" and (4) that Smith was not advancing toward Jennings or making tactical maneuvers—the jury could find that Smith did not pose an imminent threat to the safety of Jennings or others and that using deadly force in these circumstances violated Smith's clearly established Fourth Amendment right to verbally engage with the police from his back porch in a non-threatening manner. Accordingly, given the genuine issue of material fact at this stage as to whether Smith posed an imminent threat, the court cannot apply qualified immunity as a matter of law. Critical fact issues remain for the jury.

## 2. Wrongful Death

Jennings also seeks summary judgment on Smith's wrongful death claim on the grounds that it cannot succeed because (1) Jennings' use of force was justified, and (2) Smith

was contributorily negligent. The court's decision on the constitutional claims dictate the outcome on the state law claims on summary judgment. See, e.g., Jones, 2021 WL 3713063, at *12 (dismissing the state law claims because the officer's use of force was objectively reasonable). Accordingly, because genuine issues of material fact remain as to whether the use of force was justified, the court cannot grant summary judgment on the wrongful death claim.[17] Jennings' Motion for Summary Judgment is, therefore, **DENIED**.

## B. Roanoke County's Motion

Roanoke County moves for summary judgment on the sole claim against it—a Monell claim under § 1983. Def.'s Mot. Summ. J., ECF No. 188. A Monell claim subjects a local government to suit under § 1983 when an individual state actor engages in an unconstitutional action while carrying out an official policy or custom of the local government. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690–91 (1978); Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) ("To hold a municipality (a local government entity) liable for a constitutional violation under § 1983, the plaintiff must show that the execution of a policy or custom of the municipality caused the violation."). The Fourth Circuit has recognized four ways a plaintiff may prove Monell liability:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifests deliberate indifference to the rights of citizens"; or (4) through a practice that is so

---

[17] The court also cannot grant summary judgment on contributory negligence grounds. Contributory negligence is a question of fact that is proper for the "court to decide only when reasonable minds could not differ about what conclusion could be drawn from the evidence." Est. of Moses ex rel. Moses v. Sw. Va. Transit Mgmt. Co., 273 Va. 672, 678, 643 S.E.2d 156, 160 (2007) (quoting Jenkins v. Pyles, 269 Va. 383, 389, 611 S.E.2d 404, 407 (2005)).

> "persistent and widespread" as to constitute a "custom or usage
> with the force of law."

Franklin v. City of Charlotte, 64 F.4th 519, 535–36 (4th Cir. 2023) (quoting Lytle v. Doyle,
326 F.3d 463, 471 (4th Cir. 2003)). However, because a municipality may not be held liable
under the doctrine of respondeat superior, "[n]o matter which of these paths a plaintiff takes,
the 'official policy' itself must 'inflict' the alleged injury for the municipality to be liable under
§ 1983." Id. (quoting Monell, 436 U.S. at 694).

Accordingly, to prove a Monell claim, a plaintiff must show that "(1) the municipality
had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused
a violation of the plaintiff's constitutional rights." Johnson v. Baltimore Police Dep't, 500 F.
Supp. 3d 454, 459 (D. Md. 2020) (citations omitted). "[A] single incident is almost never
enough to warrant municipal liability." Est. of Jones by Jones v. City of Martinsburg, W.
Virginia, 961 F.3d 661, 672 (4th Cir. 2020), as amended (June 10, 2020) (citing Semple v. City
of Moundsville, 195 F.3d 708, 713–14 (4th Cir. 1999)); Lytle, 326 F.3d at 473 ("It is well settled
that 'isolated incidents' of unconstitutional conduct by subordinate employees are not
sufficient to establish a custom or practice for § 1983 purposes.") (quoting Carter v. Morris,
164 F.3d 215, 220 (4th Cir. 1999)).

Smith argues that Roanoke County had an unconstitutional policy or custom on two
theories. First, Roanoke County failed to properly train Jennings, as demonstrated by his
inadequate performance before the shooting. See Am. Compl., ECF No. 192, ¶¶ 150–153;
Pl.'s Opp'n Summ. J., ECF No. 197, at 33–34. Second, Roanoke County condoned or ratified
Officer Jennings' unconstitutional conduct following the incident. For the reasons set forth
below, the court concludes that summary judgment is warranted on plaintiff's Monell claim.

### 1.      Failure to Train

Smith asserts that Roanoke County is liable for its failure to address the performance deficiencies of one of its officers, defendant Jennings. Suppl. Mem. Opp'n, ECF No. 235.[18] A municipality may be liable when its failure to properly train its officers "amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). However, "deliberate indifference is a stringent standard of fault," and "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 563 U.S. 51, 61 (2011) (citations omitted). It requires that policymakers be on "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." Id. Further, "the training deficiency 'must be closely related to the ultimate injury,' meaning it must cause the incident." Est. of Jones by Jones, 961 F.3d at 672 (quoting Canton, 489 U.S. at 391).

Accordingly, to prove a Monell claim based on a failure to train, a plaintiff must show "(1) that a specific training deficiency causes city employees to violate citizens' constitutional rights and (2) that city policymakers had actual or constructive notice that the deficiency causes such violations." Brown v. City of Lynchburg, No. 6:23-cv-054, 2024 WL 2724191, at *7 (W.D. Va. May 28, 2024) (Moon, J.) (citing Canton, 489 U.S. at 390–91).

Plaintiff argues that, while she is only able to point to one instance of a constitutional violation to support her failure to train theory, which is "almost never enough to warrant

---

[18] To support this argument, Smith also contends that Jennings was so unfit for the job that Roanoke County should not have hired Jennings in the first place. Pl.'s Opp'n Summ. J., ECF No. 197, at 33–34.

municipal liability," this case falls under the narrow "Canton exception," in which the inadequacy was "so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Est. of Jones by Jones, 961 F.3d at 672 (citing Semple, 195 F.3d at 713–14, Canton, 489 U.S. at 390, and Bd. of the Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 409 (1997)).[19]

Smith points to four instances that she contends put Roanoke County on notice of Jennings' "inability to accurately perceive, analyze and react to circumstances" while on duty, which led to Smith's death. Suppl. Mem. Opp'n, ECF No. 235, at 11–12.

First, in an internal performance review of Jennings, dated October 3, 2020, Sergeant T.S. Maupin categorized Jennings' performance as "developing," and provided that "Officer Jennings is a young officer that brings a positive attitude to work" and that he "is eager to learn and has shown that he is a hard worker." Performance Review, ECF No. 197-26, at 2. Maupin continued, however, by opining that Jennings "needs to slow down to do his job effectively" and that, "by jumping into calls so quickly and not taking the time to analyze what he has, Officer Jennings will make mistakes that can hurt him or the people around him." Id.[20] Commander Johnson also provided comments on the review, similarly stating that he will "look for Jennings to slow down and ensure what he is doing is the right path." Id.

---

[19] The court assumes for the purposes of this Monell analysis that Jennings violated Smith's Fourth Amendment right.

[20] In a signed declaration, Maupin explained that his admonition to slow down was "a fairly routine reminder" that he provides to new officers. Maupin Decl., ECF No. 189-2, ¶ 6. He was not "admonishing him for his performance or disciplining him in any way." Id.

Second, Smith points to an incident on July 25, 2021, in which Jennings responded to a 911 dispatch about a "suicidal subject with a knife." Incident Report, ECF No. 197-65, at 28. Jennings writes in the report that he "misheard the information" from dispatch, and he "believed [the subject] had an ax[e]" instead of a knife. Id. The report shows that the discrepancy was resolved quickly, however, because, as Jennings approached the subject, he dropped the object, which later turned out to be a crowbar. Id. Pursuant to Roanoke County policy, the report was reviewed internally and deemed "within policy." Id. at 23.

Third, Jennings was placed on suspension on July 9, 2021, for an incident report he prepared regarding a DUI that "was written out of sequence" (i.e., "[t]he narrative of the report did not match what was occurring in Officer Jennings['] in car camera video"). ECF No. 197-27, at 3. Jennings also prepared reports with "various spelling and grammar errors." Id. Roanoke County created an action plan for Jennings, which he completed on April 13, 2022, based on his participation in a DUI refresher course and the "great improvement" he had shown in preparing reports. ECF No. 197-59, at 2.[21]

Fourth, on October 19, 2021, Maupin coached Jennings following a citizen's complaint regarding how Jennings handled an angry family member at the scene of a car accident. Incident Report, ECF No. 235-3, at 2. Specifically, Jennings decided to detain the upset family member by placing him in the back of his patrol car while they waited for the tow truck to remove the car. Id. Maupin explained that, while Jennings' actions were "not necessarily

---

[21] However, Smith also points to this suspension as an example of an instance in which Roanoke County responded sufficiently to Smith's deficiencies, undermining her failure to train theory. Pl.'s Suppl. Mem. ECF No. 235, at 7 ("Compare how Defendant Roanoke County handled Jennings' report writing and DUI procedure deficiencies to how it addressed (or failed to address) Jennings' inability to correctly perceive, analyze, and respond to citizens.").

wrong," Jennings "should have practiced better de-escalation techniques in dealing with the subject," including by showing more empathy and patience. Id. In a signed declaration, Maupin reiterated that "[n]othing Officer Jennings did was wrong or violated any policy," but that it was an opportunity for Maupin to explain alternative options for handling these situations going forward. Maupin Decl., ECF No. 189-2, ¶¶ 8–10.

These deficiencies cannot amount to a failure to train claim sufficient to survive summary judgment. Notably, while Smith portrays these incidents as examples of Jennings' inadequacies as an officer, none of them concerns a complaint of excessive force, so the court cannot conclude that it would have been clear to Roanoke County that his deficiencies would result in Smith's death. See, e.g., Moody v. City of Newport News, Va., 93 F. Supp. 3d 516, 540 (E.D. Va. 2015) ("[A p]laintiff must also establish that the City's failure to train its officers actually caused the deprivation of [the p]laintiff's rights."); Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir. 1987) ("[F]ailure to correct the known practices must be such as to make the specific violation 'almost bound to happen, sooner or later,' rather than merely 'likely to happen in the long run.'").

Further, even if these incidents did put Roanoke County on notice of a potential risk of constitutional violations, Smith does not dispute that Roanoke County responded to each with remedial efforts. If anything, the evidence shows a concerted, well-documented effort by Roanoke County to foster Jennings' continued development as a young officer. Accordingly, the evidence does not rise to the level of establishing that Roanoke County's failure to address Jennings' performance constituted "deliberate indifference to the rights of persons with whom the police come into contact." Est. of Jones by Jones, 961 F.3d at 671 (quoting Canton, 489

U.S. at 390). Instead, Jennings' decision to use deadly force against Smith was an "isolated incident[]" that is "not sufficient to establish a custom or practice for § 1983 purposes." Lytle, 326 F.3d at 473.

## 2. Ratification

Lisa Smith also alleges that Roanoke County should be liable under § 1983 because it condoned or ratified Jennings' use of deadly force after the fact. Am. Compl., ECF No. 192, ¶ 154. Under the ratification theory, when a final policymaker "has the authority to review the decision of a subordinate, its approval of that allegedly unconstitutional decision can also give rise to liability under Section 1983." Starbuck v. Williamsburg James City Cnty. Sch. Bd., 28 F.4th 529, 534 (4th Cir. 2022) (citation omitted); see also City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988). "In other words, it holds the municipality 'liable for its own decision to uphold the actions of subordinates.'" Brown, 2024 WL 2724191, at *9 (quoting Starbuck, 28 F.4th at 534). However, "[t]he Fourth Circuit has recently clarified that, when the physical harm caused by use of force has already occurred, an after-the-fact approval of use of force by a city official does not create ratification liability for a municipality." Id. (citing Franklin, 64 F.4th at 536–37).

This is the case because the constitutional violation is caused by the exercise of the force, and subsequent approval by the municipality of the use of force following an investigation "cannot undo what is done." Franklin, 64 F.4th at 537; see also Brown, 2024 WL

2724191, at *9 ("The approval, after the fact, of excessive force cannot create ratification liability because it is not the source of the injuries.").[22]

Here, Lisa Smith argues that Roanoke County should be liable under a ratification theory because "officials at the highest levels of government in Roanoke County were part of a coordinated effort to cover-up the killing and release inaccurate reports to the public." Pl.'s Opp'n, ECF No. 197, at 38. In support, Lisa Smith points to an email chain in which Commonwealth's Attorney Brian Holohan, then-Roanoke County Police Chief Howard Hall, and Roanoke County Public Information Officer Amy Whitaker are discussing the release of a public statement regarding the shooting, which Lisa Smith argues shows that "Roanoke County takes care of its own." Pl.'s Opp'n, ECF No. 197, at 38; Public Relations Emails, ECF No. 197-64. Specifically, Smith appears to take issue with the fact (1) that they discuss the timing of the release ("Amy, do you feel there is enough time to release the letter tomorrow or would you prefer to release it early next week?"), (2) that Whitaker offered to draft a quote for Holohan to use in the news release for his review and approval, and (3) that Hall indicated that he would advise Jennings that the announcement is forthcoming. Pl.'s Opp'n, ECF No. 197, at 38–39; Public Relations Emails, ECF No. 197-64.

Plainly, efforts by Roanoke County to release a statement regarding an incident that was likely generating substantial interest from the public at the time—as is the case any time there is a police involved shooting—cannot create ratification liability for a municipality.

---

[22] This is in contrast to, for example, "[a] city employee who suffers an adverse employment action that is later ratified by a city policymaker," as the aggrieved employee "may trace his or her injury back to that ratification" and "[r]epealing the ratification potentially could restore the employee back to the pre-injury status quo." Franklin, 64 F.4th at 536–37.

Roanoke County's conduct following the shooting "cannot possibly have caused the constitutional violation," <u>Franklin</u>, 64 F.4th at 537, and, accordingly, plaintiff's <u>Monell</u> claim based on a theory of ratification cannot survive this Rule 56 challenge.[23] Roanoke County's Motion for Summary Judgment, ECF No. 188, is, therefore, **GRANTED**.

## IV. CONCLUSION

For the foregoing reasons, Roanoke County's Motion for Summary Judgment, ECF No. 188, is **GRANTED**, and Jennings' Motion for Summary Judgment, ECF No. 190, is **DENIED**. The case remains set for a jury trial beginning on September 30, 2024, on the claims against Jennings.

An appropriate order will be entered.

Entered: September 4, 2024

Michael F. Urbanski
Senior United States District Judge

---

[23] To the extent that plaintiff also contends that Roanoke County's investigation into Jennings' use of deadly force creates liability through ratification, that argument fails for the same reason. <u>See, e.g.</u>, <u>Jackson v. Town of Farmville</u>, No. 3:22-cv-729, 2023 WL 3871697, at *7 (E.D. Va. June 7, 2023) ("[E]ven if [plaintiff] had identified a final policymaking authority that had decided not to discipline [the officer], the decision of that individual or entity could not undo the constitutional violation he allegedly suffered from [the officer's] excessive use of force.").